UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
STACIE ANN GRADY,

                   Plaintiff,

                                      MEMORANDUM & ORDER
     -against-                          2:20-CV-03739 (JS)

COMMISSIONER OF SOCIAL SECURITY,

                   Defendant.
--------------------------------------X
APPEARANCES
For Plaintiff:        John W. DeHaan, Esq.
                       The DeHaan Law Firm P.C.
                       300 Rabro Drive East, Suite 101
                       Hauppauge, New York  11788

For Defendant:        Jacquelyn M. Kasulis
                       United States Attorney's Office
                       Eastern District of New York
                       271 Cadman Plaza East
                       Brooklyn, New York  11201

SEYBERT, District Judge:

        Plaintiff Stacie Ann Grady ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the denial of her application for Social Security Disability Insurance Benefits by the Commissioner of Social Security (the "Commissioner"). (See Compl., ECF No. 1.)  Pending before the Court are the parties' cross-motions for judgment on the pleadings. (See Pl. Motion, ECF No. 12; Pl. Support Memo, ECF No. 12-1; Comm'r Cross-Motion, ECF No. 15; Comm'r Support Memo, ECF No. 15-1; Pl. Reply, ECF No. 16;

see also Admin. Tr., ECF No. 9.[1])   For the following reasons, Plaintiff's Motion (ECF No. 12) is GRANTED, and the Commissioner's Cross-Motion (ECF No. 15) is DENIED.

BACKGROUND[2]

I.   Procedural History

On July 6, 2018, Plaintiff filed a claim alleging a disability since April 9, 2018 (hereafter, the "Onset Date") (R. 274-75), composed of musculoskeletal pain, a torn left knee meniscus, labral tear of the left hip, carpal-tunnel syndrome in the right wrist, and anxiety or stress.   (R. 121, 274-75, 313.) Plaintiff's claim was denied; thereafter, she requested a hearing before an Administrative Law Judge ("ALJ").   (R. 151-58.) Plaintiff's claim was denied on or about September 26, 2019. (R. 37-76.)   Hence, Plaintiff requested Appeals Council ("AC") review, which was granted; the AC vacated the ALJ's decision and remanded Plaintiff's case.   (R. 144-46.)   Upon remand, another hearing was held before the ALJ (hereafter, the "2020 Hearing"); after the 2020 Hearing, on April 27, 2020, Plaintiff's claim was once more denied.   (R. 10-30, 77-102.)   Again, Plaintiff requested

---

[1]  Hereafter, the Court shall cite to the Administrative Transcript as "R" (for "Record") and provide the relevant Bates Stamp number(s).

[2]  The background is derived from the administrative record filed by the Commissioner on February 9, 2018.   (See ECF No. 9.)   For purposes of this Memorandum and Order, familiarity with the administrative record is presumed.

AC review, which was denied on June 22, 2020.  (R. 1-6, 270-73.) Therefore, the ALJ decision was rendered the final decision of the Commissioner, making it subject to judicial review under 42 U.S.C. § 405(g).

Plaintiff initiated this action on August 17, 2020 (see Compl.) and moved for judgment on the pleadings on May 21, 2021 (see Motion).  On July 20, 2021, the Commissioner cross-moved for judgment on the pleadings.  (See Cross-Motion.).  Plaintiff filed his Reply on September 2, 2021.  (See Reply.)  The Cross-Motions are ripe for decision.

## II.  Evidence Presented to the ALJ

The Court first summarizes Plaintiff's employment history before turning to Plaintiff's medical records and the testimony of the vocational expert ("VE").

### A.  Plaintiff's Employment History and Testimony

On the Onset Date, Plaintiff was a 45-year-old woman with a Bachelor of Business Administration degree, who had a major in accounting.  (R. 45-47, 121.)  She had worked for more than 20 years as a controller for different companies.  (R. 45-46.)

In August 2017, prior to the Onset Date, Plaintiff injured her knee and began using a cane.  (R. 46.)  Plaintiff testified she was "getting nosebleeds every day" and had "a lot of anxiety and nervousness leaving the house" until she "had a nervous breakdown" in December 2017, prompting her to leave work.

(R. 46-47.)  Plaintiff testified she slept for almost two days and then went to the doctor; at the doctor's office, bloodwork was performed and Plaintiff received an increased dosage in her Zoloft prescription.  (R. 47-48.)  She returned to work in January 2018 at which time she requested a modified work schedule; Plaintiff continued working until April 2018 when she was let go.  (R. 48, 84.)  Plaintiff testified she then worked one day per week at a data entry job for a friend's company, until she eventually quit due to symptoms of obsessive-compulsive disorder ("OCD"), testifying that "get[ting] out of the house was an issue." (R. 84, 96.)  She subsequently tried looking for work through the unemployment office but testified she was repeatedly told she was overqualified. (R. 60-61.)

On August 7, 2018, Plaintiff completed a function report detailing the impact of her alleged disabilities on her daily activities.  (R. 294.)  Among other things, Plaintiff explained she spent most of her time at home, engaging in household duties and looking after her children, but her level of engagement varied depending on how she was feeling any given day.  (R. 294-95.)

Plaintiff testified she could no longer work because of the mental instability she experienced leaving her house, the level of which varied from day-to-day.  (R. 51-52.)  She stated she had difficulty performing both simple and complex tasks; by way of example, Plaintiff explained she struggled balancing her personal

checkbook.  (R. 51-52.)  When questioned whether she believed she could do a two-step task, Plaintiff responded "Yeah, I'm sure I could."  (R. 92.)

Plaintiff testified that her time outside the house was largely limited to her doctor appointments, two weekly therapy sessions, and her children's sports and dance events.  (R. 52, 90.)  She also stated she did not "participate in social gatherings."  (R. 95.)  Plaintiff testified she needs to maintain a "very controlled environment" generally by being at home.  (R. 65.)  If she does not, she runs the risk of "getting to [a] manic state" followed by a depressive one.  (R. 91-92.)

Plaintiff also testified to several physical impairments, as well as the frequent need to limit her exposure to light and sound since such exposure can induce a migraine, at which point she's "done for the day into the night."  (R. 62-63.)  Plaintiff further stated she has difficulty sitting for long periods of time due to left hip bursitis and arthritis for which she receives shots of Dipyramidol every two to three months and which shots alleviate her joint pain.  (R. 54, 56.)  Plaintiff also claimed having left knee pain from arthritis, as well as bilateral hand pain, pain in her wrists, and pain in her right shoulder from fibromyalgia.  (R. 55-57.)  At her first disability hearing, Plaintiff testified she could sit and stand for 20 to 30 minutes periods and lift five to ten pounds.  (R. 58-59, 61.)  At

the 2020 Hearing, Plaintiff testified she could sit or stand for approximately one hour at a time.  (R. 86-87.)

   B.  Plaintiff's Mental Health Medical History[3]

      For years before Plaintiff alleged a disability, she received treatment for anxiety and depression. (R. 401, 424.)  As early as May 2014, Dr. Jagust noted Plaintiff's complaints of anxiety and that Plaintiff had a history of OCD.  (R. 401.)  On

---

[3]  While it is undisputed Plaintiff has physical impairments in addition to mental ones, since Plaintiff's appeal focuses upon her mental impairments, the Court does likewise.  Accordingly, no discussions of Plaintiff's physical impairments – including treatments thereof – are addressed herein.  See, e.g., Rodriguez v. Comm'n of Soc. Sec., No. 10665, 2024 WL 1342834, at *2 (S.D.N.Y. Mar. 29, 2024) (where claimant did not challenge ALJ's findings regarding claimant's physical limitations, focusing discussion on claimant's mental impairments).

   For convenience, the Court notes generally: Plaintiff's physical impairments began in June 2002 as the result of a motor vehicle accident.  (R. 385, 387, 389, 390-91.)  Due to the accident, she suffered from neck pain radiating into her left shoulder and lower back pain.  (See id.)  Thereafter, she suffered, inter alia, impaired range of motion, back pain, neck and radiating shoulder pain, and knee pain.  (See generally Pl. Support Memo at 5-6 (providing history of pre-2018 physical impairments with relevant record citations).)  Her physical impairments worsened with the passage of time.  For example, by Fall 2018, Plaintiff was diagnosed with, inter alia: fibromyalgia; left hip arthralgia; fatigue; vitamin D deficiency; Hashimoto's thyroiditis; a history of left knee surgery; and ehrlichiosis. (R. 581-82, 759-68.) Plaintiff was prescribed Flexeril.  (R. 767.)  In late April 2019, Plaintiff was noted to suffer, inter alia: polyarthralgias; polyarthritis; fatigue; morning stiffness; myalgia; positive ANA; pain in the left hip, lower back and neck; and moderate bilateral hand pain.  (R. 747-58.)  She was diagnosed with, inter alia, fibromyalgia/soft tissue rheumatism and bilateral subacromial bursitis.  (R. 752.)  Among other treatments, Plaintiff has received nerve block and other injections (R. 850-54, 855-59, 752, 882, 903-10), has worn braces, had physical therapy (R. 576), and has had surgery (R. 549-50).

June 5, 2014, Dr. Jagust prescribed Zoloft, and on September 18, 2014, he prescribed Xanax.  (R. 402.)  Both prescriptions were refilled in March 2015.  (R. 399.)  On June 18, 2015, Dr. Jagust recorded Plaintiff having increased her Xanax usage and increased her prescription for Zoloft.  (R. 425.)  Said prescriptions were continued on: September 12, 2015; November 12, 2015; January 28, 2016; May 19, 2016; and, November 3, 2016. (R. 396-98, 427.)  Once more, on April 20, 2017, Dr. Jagust increased Plaintiff's Zoloft prescription, as well as continued her prescriptions again on November 14, 2017. (R. 503-04.)

Then, in December 2017, having suffered a "mental nervous breakdown", Plaintiff went home early from her job and slept for two days until she saw a doctor, who increased her prescription for Zoloft and continued her prescription for Xanax. (R. 47-48.)  Her psychiatrist diagnosed her with bipolar disorder, and she was prescribed Seroquel.  (R. 50.)

On September 6, 2018, Dr. Jagust conducted Plaintiff's annual exam, noting Plaintiff had ongoing anxiety, depression, and fibromyalgia, but no psychiatric symptoms.  (R. 394, 559.)  Dr. Jagust refilled Plaintiff's prescriptions for Zoloft and Xanax. (R. 560.)

On December 6, 2018, Plaintiff began treatment with Frances Stincone, LCSWR[4] ("Ms. Stincone"), for symptoms of depression, anxiety, and OCD. (R. 793-824.) Plaintiff reported having periodic peaks of anxiety and periods of productivity. (R. 793.) Ms. Stincone recorded her belief that Plaintiff was "withholding information" and appeared depressed and anxious. (R. 799.)

On January 15, 2019, Plaintiff had an initial psychiatric evaluation with Linda Lyon, Psychiatric NP[5] ("NP Lyon"). NP Lyon noted Plaintiff struggled with anxiety and symptoms of OCD since "the mid 90s". (R. 825.) Plaintiff reported a history of mood swings, like those she reported to Ms. Stincone, ranging from periods of depression to periods of productivity, including cleaning bursts. (R. 825, 840.) NP Lyon diagnosed

---

[4] The acronym "LCSW" stands for "licensed clinical social worker" and the "R" was a privilege designated for those who "demonstrate[d] three years of post-LCSW supervised experience in diagnosis, psychotherapy and assessment-based treatment planning." N.Y.S. Educ. Dep't, Office of the Professions: Advisory Notices, Elimination of the "R" Privilege for Licensed Clinical Social Workers, available at https://www.op.nysed.gov/release/advisory-notices/elimination-of-the-r-privilge (last visited Sept. 11, 2024).

[5] The acronym "NP" stands for "nurse practitioner"; a Psychiatric NP is an NP specializing in the area of psychiatry. See generally N.Y.S. Educ. Dep't, Office of the Professions: N.Y.S. Licensed Professionals, Nurse Practitioners, Certification Requirements for Nurse Practitioners, available at https://www.op.nysed.gov/professions/nurse-practitioners/certification-requirements (last visited Sept. 11, 2024).

unspecified mood (affective) disorder, dysthymic disorder, anxiety disorder, OCD, and alcohol dependence. (R. 838.) She prescribed Seroquel to Plaintiff for mood stabilization. (R. 840.)

On April 5, 2019, Plaintiff followed up with Suzanne Kontak, Psychiatric NP ("NP Kontak"), who noted Plaintiff reported a "significantly improved mood, less irritability, improved sleep, and no racing thoughts". (R. 842.) In an April 12, 2019 treating source statement, NP Kontak stated: "Anxiety limits [Plaintiff's] ability to leave her house. OCD impairs her ability to complete tasks in a timely manner. Mood swings/depression/euphoria impairs her ability to communicate with others in a calm, professional manner." (R. 691-92.) On May 1, 2019, NP Kontak noted Plaintiff reported improved mood stability on her current medication regimen using Seroquel and Plaintiff was titrating down her use of Zoloft; going forward, Plaintiff was to continue with her Seroquel and to decrease her daily dosage of Zolof. (R. 843.)

On May 31, 2019, Dr. Jagust noted both that Plaintiff was responding well to Seroquel and was still seeing her therapist twice weekly.

On June 7, 2019, Ms. Stincone and Dr. Jagust completed a questionnaire entitled "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" questionnaire (hereafter, the "Questionnaire Response"). (R. 860-62.) In their Questionnaire Response, Ms. Stincone and Dr. Jagust stated Plaintiff had marked

limitations: in her abilities to understand, remember, and carry out complex instructions; to make judgments on complex work-related decisions; to interact appropriately with supervisors; and, respond to usual work situations and changes in a routine work setting. (R. 860-61.) They reported Plaintiff had moderate limitations in her abilities to: understand and remember simple instructions; make judgments on simple work-related decisions; and, to interact appropriately with co-workers. (R. 860-61.) Ms. Stincone and Dr. Jagust also indicated Plaintiff had mild limitations in her abilities to carry out simple instructions and to interact appropriately with the public. (R. 860-61.) They further explained Plaintiff: has difficulty adjusting to change and interacting appropriately with others due to anxiety; suffers daily sadness and irritability, due to depression, which negatively impacts her comprehension and ability to interact with others; is often fatigued or has excess energy, which impacts her interactions with others; often needs days alone to "get back to normal"; and, because of impaired memory, has difficulty comprehending and, therefore, repeatedly asks the same question before she grasps what is being asked of her. (R. 861.) These limitations were observed existing since at least December 8, 2018. (Id.)

On October 22, 2019, Alexandra Matthews, PA-C[6] ("PA Matthews"), saw Plaintiff for a three-month check-up and to request medication refills. (R. 876.) PA Matthews noted Plaintiff was continuing weekly individual and group therapy and recommended Plaintiff continue with same. (R. 877.) After her exam of Plaintiff, among other things, PA Matthews assessed Plaintiff as having bipolar disorder, unspecified, and refilled her prescription medications. (Id.)

On February 11, 2020, Ms. Stincone completed an updated Questionnaire Response (hereafter, the "2020 Updated Response"). (R. 914-16.) She indicated Plaintiff had: marked limitations in her abilities to understand, remember, and carry out complex instructions; moderate limitations making judgments on complex work-related decisions and responding appropriately to usual work situations and changes in a routine work setting; and mild limitations in her abilities to understand, remember, and carry out simple instructions, to make judgments on simple work-related decisions, and to interact appropriately with the public,

---

[6] "The designation PA-C stands for Physician Assistant-Certified and may be used only by PAs who have successfully completed the [National Commission on Certification of Physician Assistants] certifying examination and possess a valid certification." N.Y.S. Dep't of Health, Professional Medical Conduct and Physician Discipline, Reference Information: Physician Assistant, available at https://www.health.ny.gov/professionals/doctors/conduct/physician_assistant.htm#:~:text=The%20designation (last visited Sept. 11, 2024).

supervisors, and co-workers.  (R. 914-15.)  Ms. Stincone further explained Plaintiff had difficulty focusing and maintaining productivity, and was dependent on a support animal. (R. 915.)

      C.    The Psychiatric Consultative Examination

On September 18, 2018, Kathleen Acer, Ph.D., performed a psychiatric consultative examination (hereafter, a "Consult Exam").  (R. 568.)  Dr. Acer observed Plaintiff "was dressed in an appropriate and fairly-groomed fashion" and made eye contact but was "scattered and difficult to focus."  (R. 569.)  She noted Plaintiff had a nervous mood and affect, had intact attention and concentration, and had average cognitive functioning.  (R. 569.) The Doctor diagnosed Plaintiff with adjustment disorder with mixed anxiety and depressed mood.  (R. 570.)  Dr. Acer stated Plaintiff had "mild limitations" "consistent with stress related issues, but this does not appear to be severely hampering her functioning." (R. 570.)

      D.    The VE's Testimony

At the 2020 Hearing, the VE testified Plaintiff's prior work was highly skilled, but sedentary.  (R. 97.)  When asked by the ALJ whether there were available jobs for a hypothetical individual with "the same age, education, background, work history, transferable skills" as Plaintiff, who could perform sedentary work for one-hour periods followed by two-minute breaks, with said work limited to (1) one- or two-step tasks,

(2) occasional interaction with the general public and co-workers, (3) occasional decision-making that could affect the work setting, as well as (4) various physical limitations (R. 98.), the VE responded such jobs did exist in the national economy. (Id.) By way of example, he identified a Board Assembly Inspector, a Document Preparer, and a Call-Out Operator. (R. 99.) Moreover, the VE testified such jobs were available to those who can interact only occasionally with a supervisor. (Id.) When questioned by the VE whether being on-task only 80 percent of the workday, i.e., off-task for 20 percent of the workday, would affect the ability of the subject hypothetical person from securing a job, the VE responded in the affirmative. (R. 99-100.) Relatedly, when Plaintiff's counsel inquired of the VE whether being absent from work for more than a day-and-a-half per month would impact that hypothetical individual's ability to secure employment in one of the identified jobs, the VE again responded affirmatively. (R. 100.)

DISCUSSION

I.   Standard of Review

When reviewing a final decision of the Commissioner, a district court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." Rucker v.

Kijakazi, 48 F.4th 86, 90-91 (2d Cir. 2022) (quoting Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir. 2019)).  District courts will overturn an ALJ's decision only if the ALJ applied an incorrect legal standard, or if the ALJ's ruling was not supported by substantial evidence. Id. (citing Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012)).  "[S]ubstantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

II.  The ALJ's Decision and the Five-Step Disability Analysis

First, the ALJ found Plaintiff meets the insured status requirements through September 30, 2017. (R. at 15.)  The ALJ then applied the five-step disability analysis and concluded Plaintiff was not disabled from the Onset Date through the date of his 2020 Decision (R. 13-25).  (See R. 25); 20 C.F.R. § 404.1520.

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged Onset Date. (R. 15.)

At step two, the ALJ determined Plaintiff "has the following severe impairments:  status post-left knee arthroscopy, left hip degenerative changes, obesity, bilateral shoulder degenerative changes, bilateral carpal tunnel syndrome, fibromyalgia, major depressive disorder, [and] anxiety disorder

unspecified" which impairments "impose more than minimal functional limitations." (R. 15-16 (bold emphases omitted).) There was no mention of Plaintiff's bipolar depression.

At <u>step three</u>, the ALJ determined Plaintiff's impairments or combination thereof did not meet or medically equal the severity "of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1" of the Social Security regulations because, considered singly or in combination, the severity of Plaintiff's mental impairments "d[id] not meet or medically equal the criteria of listings 12.04 and 12.06". (R. 16.) The ALJ's finding was based upon the "'paragraph B' criteria", which considers the impact of a claimant's mental impairments in four categories: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) managing herself. (R. 16.) <u>As to Category One</u>: The ALJ examined Plaintiff's abilities for understanding, remembering, or applying information and found Plaintiff had mild limitations based upon her stating "she could perform simple maintenance, prepare meals, pay bills, shop, and drive." (R. 16.) <u>As to Category Two</u>: The ALJ found Plaintiff had a moderate limitation in her ability to interact with others because she stated she is "able to get along with others, shop, and live with others" and the medical evidence described Plaintiff "as pleasant and cooperative." (<u>Id.</u>) <u>As to Category Three</u>: The

ALJ further determined Plaintiff was moderately limited regarding concentration, persistence, and maintenance-of-pace. (Id.)  The ALJ based this assessment upon Plaintiff stating she is "able to drive, prepare meals, watch TV, manage funds, and use the internet" and there was no record evidence of "distractibility". (Id.)  As to Category Four:  The ALJ determined Plaintiff suffered "no limitations in her ability to adapt or manage herself" because she "is able to handle self-care and personal hygiene and care for children" and "the objective evidence in the record showed [Plaintiff] to have appropriate grooming and hygiene." (Id.) At bottom, because Plaintiff's mental impairments did not cause at least two "marked" limitations or one "extreme Limitation, the ALJ found Plaintiff did not satisfy the "paragraph B" criteria. (Id.) Moreover, as to the alternative "paragraph C" criteria, in a conclusory manner, the ALJ stated "the evidence fails to establish the presence" of those criteria. (R. 17.)

At step four, the ALJ determined Plaintiff had the residual functional capacity ("RFC"):

> to perform sedentary work . . . except: sit 1 hour followed by a 2 minute break; occasional stooping, crouching, crawling, kneeling, squatting, climbing; frequent use of hands for fine and gross motor skills; limited to one- or two- step tasks, occasional interaction with the public, coworkers, and supervisors[;] low stress work defined as occasional decision-making and occasional changes in work setting.

(Id.); see also 20 CFR § 404.1529. To support his RFC determination, the ALJ stated he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Id.)

Specific to Plaintiff's mental impairments, observing Plaintiff applied for disability insurance benefits on July 6, 2018, the ALJ stated Plaintiff first saw Dr. Ahmed a month earlier and reported to the Doctor that she had a history of anxiety and depression; Plaintiff also claimed she was unable to work due to anxiety and depression, which conditions Dr. Ahmed was treating. (R. 20.) Two months later, on September 6, 2018, Plaintiff saw Dr. Jagust who, notwithstanding observing Plaintiff did not present with "gross evidence of depression", prescribed Plaintiff Zoloft and Xanax and diagnosed her with major depressive disorder and anxiety disorder, unspecified. (Id.) A few weeks later in September 2018, Plaintiff saw Dr. Acer for a psychological Consult Exam, who found Plaintiff: appropriately dressed and groomed; made appropriate eye contact; used adequate expressive and receptive language skills, but whose speech, while fluent, was somewhat pressured due to anxiety; was not evidencing hallucinations, delusions or paranoia, but had irrelevant and scatter thought processes; had a mood and affect which were nervous; and, was alert and oriented, with intact attention and concentration, as well as

intact recent and remote memory skills. (Id.) The ALJ highlighted that in November 2018, Plaintiff went to Farmingville Mental Health Clinic for treatment, where she reported experiencing anxiety attacks, mania, and compulsive behavior, i.e., excessive cleaning and organizing, even though she "simultaneously told the Social Security Administration that she was quite limited in her cleaning abilities due to her physical impairments." (Id.) The psychiatric nurse practitioner found Plaintiff: behaved cooperatively; presented neatly groomed and dressed; had a depressed and anxious mood, with her affect congruent to mood; exhibited speech, eye contact, and psychomotor behavior within normal limits; did not appear delusional; to have thought process that could be tangential but with content that was logical; and, cognitively intact. (Id.) In a subsequent, late-January 2019 appointment, Plaintiff reported a manic cleaning episode, which led to her being prescribed Seroquel. (Id.) Subsequently, in early-April 2019, Plaintiff "reported significantly improved mood, less irritability, denied racing thoughts, and also ha[d] improved sleep with the addition of Seroquel." (Id.) Therefore, Plaintiff's dosage of Zoloft began to be reduced with no development of depressive symptoms. (Id. at 20-21.) Again, in early- and late-May 2019, Plaintiff reported: "improved mood stability on [her] current medical regimen of Seroquel"; "that Seroquel was 'working well for her'"; and, "no psychiatric symptoms". (Id. at 21.) "[T]here was no evidence of

depression on examination." (Id. (citing Ex. 24F (Dr. Jagust's Office Treatment Records from Nov. 14, 2017 to May 31, 2019)).) The ALJ concluded that during a mid-September 2019 endocrinology follow-up appointment, Plaintiff: "was oriented in time, place, and person"; "had a normal mood and affect"; and, exhibited normal recent and remote memory. (Id.)

In his analysis of the record, as to Plaintiff's mental impairments, the ALJ underscored: while claiming she experienced a nervous breakdown in 2017, "[t]here is no evidence of psychiatric hospitalization" and Plaintiff "did not seek outpatient psychiatric treatment until after she filed her disability application" (R. 21); Plaintiff was "treated by a psychiatric nurse for less than a year before she was 'cleared' to have her primary care provider prescribe medications" (id.); and, finding Plaintiff's activities of daily living to be inconsistent with her claims, (curiously) stating, by way of example, that Plaintiff testified she was confined to her house, except for doctors' appointments, but drove herself to her Consult Exams (see id.). The ALJ found Ms. Stincone's 2020 Updated Response, in which Ms. Stincone reported only one category of marked limitations, i.e., that of understanding, remembering, and carrying out complex work-related decision, to be consistent with: the cognitive and behavioral functioning observed in treatment notes and the psychiatric Consult Exam; and, the conservative level of treatment

received by Plaintiff. (See id. at 22 (citing Ex. 34F (2020
Updated Response).) Accordingly, the ALJ found Ms. Stincone's
2020 Updated Response persuasive and relied upon it to limit
Plaintiff: to simple tasks and decision-making; regarding
workplace changes; and, in exposure to social interactions. (See
id.) He then proceeded to contrast his assessment of the 2020
Updated Response with the 2019 Questionnaire Response completed by
Dr. Jugust and Ms. Stincone, highlighting the earlier
Questionnaire Response identified two categories of marked
limitations, i.e., the category regarding understanding,
remembering, and carrying out complex instructions; and the
category regarding interacting with supervisors, and responding
appropriately to usual work situations and to changes in routine
work settings. (See id. at 22 (citing Ex. 29F (Questionnaire
Response)).) The Questionnaire Response indicated the reasons for
these limitations were: Plaintiff's moods were unstable; having to
leave her house exacerbated Plaintiff's anxiety and required her
to recover from said anxiety; and, because of depressive symptoms
she suffered, Plaintiff's daily sadness and irritability
negatively impacted her ability to engage in sustained work
requiring comprehension and being around and interacting with
others. (See id. at 23.) The ALJ found the Questionnaire
Response's "marked" limitations findings were not persuasive
because: said limitations were "not supported by any mental status

examination findings"; the Questionnaire Response (i) was issued a week after Dr. Jagust's physician's assistant found no evidence of depression after examining Plaintiff, (ii) noted Plaintiff "had been 'cleared' by psychiatry", and (iii) noted Plaintiff's improvement on Seroquel; "Dr. Jagust is not a psychologist or psychiatrist"; and, in her progress notes, Ms. Stincone reported Plaintiff cognitively intact but did not report mood instability or inappropriate behavior that would affect appropriately interacting with others. (Id.) Moreover, the 2020 Updated Response "was less restrictive which shows medical improvement." (Id.)

However, the ALJ found the earlier, 2018 opinion rendered by Dr. Acer after her Consult Exam of Plaintiff to be persuasive. (R. 23.) Upon examination, Dr. Acer found, inter alia, Plaintiff: had only mild limitations regulating emotions controlling behavior and sustaining an ordinary routine; but had intact attention, concentration, and memory. (See id. (citing Ex. 17F (Acer Sept. 2018 Report)).) The ALJ stated Dr. Acer's 2018 opinion was "consistent with the conservative course of treatment [Plaintiff] ha[d] received." (Id.)

Conversely, the ALJ found NP Kontak's April 2019 Certification, which indicated Plaintiff's "impairments consist of anxiety, depression, OCD, euphoria, mood swings, bipolar" and which impairments affected her abilities to leave her home,

complete tasks in a timely manner, and communicate with others in a professional manner, was not persuasive. (Id. (citing Ex. 21F).) He stated NP Kontak's opinion "conflicts with mental status findings of Ms. Kontak and her colleagues at the Farmingville Mental Health Clinic." (Id.) He also found it "remarkable" that a month later "[NP] Kontak indicated that [Plaintiff] was 'cleared' psychiatrically and could continue with her primary care practice for psychiatric medications" which was "inconsistent with [NP Kontak's] report." (Id.)

At step four, the ALJ concluded "the demands of [Plaintiff's] past relevant work exceed the residual functional capacity" and Plaintiff "is unable to perform past relevant work as actually or generally performed." (R. 24.) However, based upon Plaintiff's age, education, work experience, and RFC, the ALJ determined jobs existing in significant numbers in the national economy were available that Plaintiff could perform. (See id.) Without clear explanation, the ALJ proceeded to discuss sedentary work that, given Plaintiff's additional limitations, may be available to Plaintiff. (See id.) Thus, at step five, the ALJ determined Plaintiff could make a successful adjustment to unskilled sedentary work existing in significant numbers in the national economy, as described by the VE during Plaintiff's 2020 Hearing. (See id.) Hence, the ALJ determined Plaintiff was not disabled. (R. 25.)

III. <u>Analysis</u>

      Plaintiff advances two arguments on appeal: (1) the ALJ erred by finding Plaintiff's bipolar disorder was not a severe impairment, especially in light of her medical records and the ALJ's prior 2019 decision in which he found one of Plaintiff's severe impairments was bipolar disorder (<u>see</u> Pl. Support Memo at 22); and (2) the ALJ did not properly consider the medical evidence before him, cherry-picking evidence to support his decision (<u>see</u> <u>id.</u> at 26) and failing to seek clarifications regarding purported inconsistencies in the record (<u>see</u> <u>id.</u> at 27, 29-30). In opposition, the Commissioner contends: (a) the ALJ "properly weighed medical evidence and other evidence", as well as "Plaintiff's improvement with treatment, and her daily activities" (Comm'r Support Memo at 17; <u>see also</u> <u>id.</u> at 24); and (b) Plaintiff did not rely upon her physical impairments as a basis for not being able to work, but which physical impairments the ALJ found did not preclude sedentary work (<u>see</u> <u>id.</u> at 24-25).

      The Court first considers the record before it. It is well-established:

> Social Security proceedings are non-adversarial and the ALJ is obliged "to investigate the facts and develop the arguments both for and against granting benefits." <u>Sims v. Apfel</u>, 530 U.S. 103, 111, 120 S. Ct. 2080, 147 L. Ed. 2d 80 (2000) (citation omitted). This obligation applies even if the claimant is represented by counsel. <u>See, e.g.,</u> <u>Rosa v. Callahan</u>, 168

F.3d 72, 79 (2d Cir. 1999) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)).  The ALJ's duty to develop the record has been described as a "bedrock principle of Social Security law." Batista v. Barnhart, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004) (citing Brown v. Apfel, 174 F.3d 59 (2d Cir. 1999)).

Michelle C. v. Comm'r of Soc. Sec., No. 23-CV-7144, 2024 WL 1706000, at *5 (S.D.N.Y. Apr. 3, 2024), report and recommendation adopted, 2024 WL 1702127 (S.D.N.Y. Apr. 18, 2024).  Moreover, it has been "consistently recognized that 'an ALJ has a heightened duty to develop the record when a claimant asserts a mental impairment.'"  Id. at *6 (quoting Gabrielsen v. Colvin, No. 12-CV-5694, 2015 WL 4597548, at *4-5 (S.D.N.Y. July 30, 2015) (collecting cases)).  Indeed, "[t]his 'heightened duty' derives from the fact that a claimant's mental illness may greatly impede an evaluator's assessment of a claimant's ability to function in the workplace, thus necessitating a more thorough review."  Id. (quoting Piscope v. Colvin, 201 F. Supp. 3d 456, 462-63 (S.D.N.Y. 2016)).  In that vein, "[t]he duty to develop the record . . . includes the duty to re-contact physicians when needed to afford the claimant a full and fair hearing based on an adequately developed record."  Id.

"Whether the ALJ has satisfied this duty to develop the record is a threshold question.  Before determining whether the Commissioner's final decision is supported by substantial evidence

. . . the court must first be satisfied that the ALJ . . .
completely developed the administrative record." Campbell v.
Comm'r of Soc. Sec., No. 19-CV-4516, 2020 WL 4581776, at *14
(S.D.N.Y. Aug. 10, 2020); see also Telesco v. Comm'r of Soc. Sec.,
577 F. Supp. 3d 336, 353 (S.D.N.Y. 2021) (finding, even though
claimant did not challenge sufficiency of the record, ALJ erred by
failing to adequately develop the record); Berte v. Comm'r of Soc.
Sec., No. 20-CV-2889, 2023 WL 2760515, *3 (E.D.N.Y. Apr. 3, 2023)
(remanding case where ALJ based his non-disability determination
on deficiencies in claimant's medical records because ALJ failed
to develop said record) (collecting cases); Sanchez v. Saul,
No. 18-CV-12102, 2020 WL 2951884, at *23 (S.D.N.Y. Jan. 13,
2020) ("As a threshold matter, and regardless of the fact that
Plaintiff did not raise an express challenge to the adequacy of
the Record, this Court must independently consider the question of
whether the ALJ failed to satisfy his duty to develop the
Record."), report and recommendation adopted, 2020 WL 1330215
(S.D.N.Y. Mar. 23, 2020).  "Failing to adequately develop the
record is an independent ground for vacating the ALJ's decision
and remanding for further findings." Diano v. Comm'r of Soc. Sec.,
No. 19-CV-2265, 2020 WL 13555076, at *16 (E.D.N.Y. Dec. 2, 2020)
(citing Rosa, 168 F.3d at 83 (finding remand "particularly
appropriate" where ALJ failed to obtain adequate information from

treating physicians and potentially relevant information from other doctors)) (collecting cases).

Here, the Court is not satisfied the ALJ properly developed the administrative record. The following instances highlight example problems with said record.

As to Plaintiff's Bipolar Disorder: In his initial September 2019 decision, the ALJ found one of the severe impairments Plaintiff suffers is bipolar disorder. (R. 127.) And, he acknowledged Plaintiff's severe impairment of bipolar disorder at the beginning of Plaintiff's second, 2020 Hearing. (R. 85.) Yet, there is a complete absence of any discussion of this impairment in his 2020 Decision; it appears, therefore, the ALJ failed to consider the impact Plaintiff's bipolar symptoms would have on her RFC. Such failure warrants a remand. Cf., e.g., Biestek v. Berryhill, 587 U.S. 97, 102 (2019) ("On judicial review, an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'") (quoting 42 U.S.C. § 405(g)); see also 20 C.F.R. § 404.1520(a)(3) ("We will consider all evidence in your case record when we make a determination or decision whether you are disabled." (emphasis added)); Viets v. Kijakazi, No. 3:21-CV-1241, 2023 WL 2706233, at *4 (D. Conn. Mar. 30, 2023) (remanding case to Commissioner "because the ALJ failed to mention . . . two severe impairments at Step Three"; therefore, the court could not "determine whether the ALJ properly evaluated the

combination of [claimant's] impairments for medical equivalence") (collecting cases); Notaro v. Berryhill, No. 16-CV-0603, 2017 WL 4324690, at *3 (W.D.N.Y. Sept. 29, 2017) ("The ALJ's failure to consider plaintiff's various other mental health diagnoses at steps two and three constituted reversible error, because a full consideration of plaintiff's anxiety, PTSD, and personality disorder could have affected the outcome of his application.").

As to the paragraph C criteria: Notwithstanding acknowledging one of the severe impairments Plaintiff alleged she was suffering was bipolar disorder (see 2020 Hr'g, R. 85), and stating he "considered whether the 'paragraph C' criteria are satisfied", the ALJ baldly concluded "the evidence fails to establish the presence of the 'paragraph C' criteria." (R. 17.) Indeed, he provided no discussion whether Plaintiff could demonstrate a minimal capacity to adapt to changes in her environment or to demands not already a part of her daily life, part of the paragraph C analysis. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04. Yet, at her 2020 Hearing, Plaintiff testified, inter alia: it was difficult for her to leave her house (R. 87); she barely leaves her home, other than for doctor appointments (R. 88; see also R. 95); after she tried to go to a store, she had a "bad episode" where she had to leave the store mid-shopping, and then went home, proceeded to vomit, and had difficultly breathing (id.); she cannot approach tasks outside her routine without

getting into a manic state (R. 91; see also 96); she must adhere to the "exact same routine every day" and maintain a controlled environment for her mental well-being (R. 92); and, she does not participate in social gatherings (R. 95). Such testimony presents colorable evidence Plaintiff suffers from bipolar disorder warranting a further discussion of the paragraph C criteria. Cf., e.g., Santiago Sanchez v. Comm'r of Soc. Sec., No. 20-CV-7653, 2022 WL 3152585, at *5 (S.D.N.Y. Aug. 8, 2022) ("The threshold for demonstrating a severe impairment [at step two] is low."); see also generally Garcia v. Comm'r of Soc. Sec., 496 F. Supp. 2d 235, 242-43 (E.D.N.Y. 2007) (where ALJ's findings did not satisfy the criteria of Listing 12.04, which addresses bipolar disorders, finding there was not substantial evidence to support ALJ's decision). Upon such a showing, the ALJ was obligated to take steps to further develop the record. See, e.g., Jackson v. Kijakazi, 588 F. Supp. 3d 558, 577 (S.D.N.Y. 2022) (stating an ALJ's duty to develop the record "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." (citations omitted)); Berte, 2023 WL 2760515, *3 ("Since [the] ALJ . . . relied on the lack of diagnostic testing in Plaintiff's medical records to find her not disabled, he should have more fully developed the record with

respect to the diagnostic tests listed in Plaintiff's medical records.").

As to Dr. Jagust and Ms. Stincone's Questionnaire Response: In discounting the Questionnaire Response of Dr. Jagust and Ms. Stincone, the ALJ made much of Plaintiff's contention she "had been 'cleared' by psychiatry." (R. 23.) However, as Plaintiff persuasively argues: "This reference to Dr. Jagust's May 31, 2019, office visit note actually raises more questions than it answers." The Court agrees. It appears the notation (see R. 689) is taken out of context since "earlier in the same note," the Doctor reported, "Therapist asked [Plaintiff] to discuss with PCP if we can start writing the Seroquel for her. [Plaintiff] states they will send all records to us if we need to have them on file and has already filled out authorization forms to do so." (R. 688.) The more logical explanation, as advanced by Plaintiff is, she was not "released from psychiatric treatment as much as the management of her medication was transferred from NP Lyons to Dr. Jagust." (Pl. Support Memo at 29.) Again, the Court concurs and further concurs that, at a minimum, this note "merited further inquiry by the ALJ" to clarify what was meant by being "cleared". (Id.)

Relatedly, Plaintiff contends it is "outrageous" the ALJ discounted Dr. Jagust and Ms. Stincone's Questionnaire Response on the basis that it lacked clinical support

> in light of the facts that (a) the treatment
> records of Ms. Stincone, who treated
> [Plaintiff] weekly from December 6, 2018,
> through at least April 7, 2020--a period of
> almost 70 weeks--are not contained in the
> Administrative record (except for the initial
> evaluation at Tr. 793-824); and (b) the ALJ
> did not make any attempt to obtain said
> records.

(Id.)  In opposition, the Commissioner urges the Court to "reject Plaintiff's argument that the ALJ should have developed the record by obtaining hypothetical treatment notes from Ms. Stincone" (Comm'r Support Memo at 20), asserting there were "extensive records from Farmingville, where Ms. Stincone worked, as well as medical source statements signed by Ms. Stincone."  (Id. (citing R. 793-844, 860-62, 914-16).)

The Commissioner's argument is patently unavailing. Approximately 70 weeks of treatment notes is not insignificant; it is inconceivable that such an expanse of records do not contain relevant insight into Plaintiff's mental impairments. Cf., e.g., Wergen v. Comm'r of Soc. Sec., No. 20-CV-3558, 2024 WL 4107081, at *13 (E.D.N.Y. Sept. 5, 2024) (finding ALJ failed to properly develop record where, inter alia, he did not discuss, let alone mention, treatment notes of claimant's LMSW who met with claimant approximately a dozen times in a years' span; remanding case); Jackson, 588 F. Supp. 3d at 583 ("[A]n ALJ's duty to develop the record takes on heightened importance with respect to a claimant's treating medical sources, because those sources 'are likely to be

the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations.'" (quoting Acosta Cuevas v. Comm'r of Soc. Sec., No. 20-CV-502, 2021 WL 363682, at *11 (S.D.N.Y. Jan. 29, 2021), report and recommendation adopted, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022))). While, perhaps, not outrageous, the ALJ's "failure to request Ms. Stincone's treatment notes provides another example of his failure to fully develop the record." Here, such failure warrants remand. See, e.g., Diano, 2020 WL 13555076, at *16 (stating ALJ's "duty to develop [the record] 'includes ensuring that the record as a whole is complete and detailed enough to allow the ALJ to determine the claimant's RFC'" (quoting Sigmen v. Colvin, No. 13-CV-0268, 2015 WL 251768, at *11 (E.D.N.Y. Jan. 20, 2015); further citation omitted)); see also Khan v. Comm'r of Soc. Sec., No. 14-CV-4260, 2015 WL 5774828, at *15 (E.D.N.Y. Sept. 30, 2015) (finding ALJ "ignored his affirmative duty to develop the record" by rejecting opinions of treating sources "for lack of documentary support"); Barbour v. Astrue, 950 F. Supp. 2d 480, 490 (E.D.N.Y. 2013) (finding ALJ erred by rejecting the treating doctor's opinions without first attempting to fill any clear gaps in the administrative record (quoting Rosa, 168 F.3d at 79)).

In sum, upon review of the record presented, the Court finds the ALJ's failure to adequately develop the record provides an independent basis for vacating his decision and remanding this case back to the Commissioner for further findings. See Rosa, 168 F.3d at 83; see also, e.g., Moran v. Astrue, 569 F.3d 108, 114-15 (2d Cir. 2009); Diano, 2020 WL 13555076, at *16 (citing Rosa). Therefore, the Court declines to consider Plaintiff's further arguments in support of remand.[7]

---

[7]  The Court notes the ALJ's consideration (or lack thereof) of part of the VE's testimony gives the Court pause.  The Commissioner highlights Plaintiff testified "she could not work based on her mental impairments rather than her physical impairments" (Comm'r Support Memo at 24 (citing R. 87)), and that, as a whole, the evidence supported the ALJ's conclusion "Plaintiff had the physical RFC to perform sedentary work with only occasional stooping, crouching, crawling, kneeling, squatting, and climbing." (Id. at 25.)  However, the ALJ also included the limitation of Plaintiff sitting one hour at a time followed by a two-minute break and the limitations "to one- or two- step tasks, occasional interaction with the public, coworkers, and supervisors, low stress work defined as occasional decision-making and occasional changes in work setting." (R. 17.)  Thus, the Commissioner does not present the full picture.
    At Plaintiff's 2020 Hearing, when the ALJ questioned the VE about the subject hypothetical individual, he posed an additional scenario for the VE's consideration: Would there be jobs available for the hypothetical individual if that individual was "on-task only 80 percent of the workday". (R. 99.)  The VE testified that with this additional scenario to consider, the sedentary jobs the VE had identified would not be available since "[t]hat's too much time . . . off-task". (Id. at 99-100.)  Similarly, in responding to questioning by Plaintiff's counsel, the VE testified that more than one-and-a-half days of absenteeism per month would be unacceptable to maintain employment. (See id. at 100.)  Yet, in his determination that Plaintiff was not disabled, the ALJ glaringly failed to take into consideration the VE's testimony about an individual being off-task 20 percent of the time or being absent more than one day per month. (R. 24-25.)  Indeed, he did

To the extent Plaintiff requests a new hearing before a different ALJ (see Pl. Support Memo at 30), that request is denied. The Court finds no basis for concluding the ALJ is not able to apply the appropriate legal standard upon remand; nor are there any indications of bias or hostility on the part of the ALJ. See Roberto v. Saul, No. 20-CV-1923, at *8-9 (E.D.N.Y. Sept. 1, 2021) (discussing standards for reassignment). "Thus, the Court leaves the decision of which ALJ should preside over the remanded proceeding to the Commissioner's discretion." Id. at *9.


CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Motion (ECF No. 12) is GRANTED, and the Commissioner's Cross-Motion (ECF No. 15) is DENIED. This matter is REMANDED for proceedings consistent with this Memorandum and Order.

---

not even provide the required explanation for his decision to ignore this portion of the VE's testimony, which would require remand for the ALJ to do so. See Karle v. Colvin, No. 12-CV-3933, 2013 WL 4779037, at *3 (S.D.N.Y. Sept. 6, 2013) (remanding case where ALJ ignored VE's testimony that it would be difficult to find employment for hypothetical individual who would be excessively off task); see also Karle v. Astrue, No. 12-CV-3933, 2013 WL 2158474, *18 (S.D.N.Y. May 17, 2013) (recommending case be remanded because, inter alia, ALJ failed to provide required explanation for his decision to ignore VE's testimony regarding hypothetical individual who would require time off task, thereby making it difficult to find said individual employment) (collecting cases).

**IT IS FURTHER ORDERED** that the Clerk of the Court enter judgment accordingly and, thereafter, mark this case CLOSED.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    October 28, 2024
          Central Islip, New York